Edward J. CANAVAN, et al., Plaintiffs,

v.

WASHINGTON CHEMICAL SALES OF CALIFORNIA, INC., et al., Defendants/Cross-Plaintiffs,

v.

UNITED STATES GOVERNMENT, Cross-Defendant.

No. 77–6459–CIV–SPELLMAN.

United States District Court, S.D. Florida, Miami Division.

March 21, 1986.

Jon Krupnick, Ft. Lauderdale, Fla., for plaintiffs.

Gerald Pyszka, Seth Abrams, Miami, Fla., Leon B. Taranto, Dept. of Justice, Washington, D.C., Jack Thompson, Marc Cooper, Miami, Fla., for defendants/cross-plaintiffs.

## MEMORANDUM OPINION AND ORDER ON SETTLEMENT

SPELLMAN, District Judge.

### I

### INTRODUCTION

Although this complex products liability case has been vigorously prosecuted by all of the parties, a combination of unfortunate factors has resulted in this case becoming one of the oldest pending cases in the Southern District of Florida. This Court accordingly has given the resolution of this matter the highest priority and set the case for trial by Jury on the March trial calendar.

At the Calendar Call the Friday prior to trial, this Court learned that there had been, for the first time, some meaningful settlement discussions amongst the various parties. However, there were two major obstacles to an amicable resolution of the matter: first, the complexity of the case itself; and second, the existence of the Longshoreman and Harbor Workers lien that was stated to be in excess of $320,000 in past benefits alone. Due primarily to these difficulties, the parties were unable to make progress toward settlement and requested this Court's assistance.

This Court responded by ordering a settlement conference on the day prior to the start of the trial and required representatives with settlement authority to be in attendance at the hearing. This Court wished the prospect of settlement to be fully explored before commencing what was undoubtedly going to be a long trial for the Court and an expensive undertaking for each of the litigants.

### II

### FACTUAL ALLEGATIONS

Throughout the pretrial procedure and the settlement conference, the Court has learned that it is the Plaintiffs' position that the following allegations are true in this case and that the Defendants deny the truth of these allegations.

The accident occurred on November 4, 1976. On that date, Edward Canavan, a plumber working at the AUTEC base in the Bahamas, poured a cup of caustic soda into a drain in an effort to unclog it. After a few seconds, upon hearing a gurgling sound, Canavan looked down the pipe to see if the caustic soda was working. At that very moment, the caustic material blew back out of the drain and struck Canavan in the face and in his eyes. This caused not only severe chemical burns, but ultimately resulted in only the most limited eyesight in one eye. This impediment pre-

vents him from reading, watching television, and engaging in any gainful employment. Edward Canavan requires the attendant care of his wife to assist him in all household functions and in walking when they are outside their home. At the time of the accident itself Mr. Canavan was 45 years of age and his wife was 35 years of age.

Although Edward Canavan had been a plumber all of his life, he maintained that he had not become familiar with caustic soda and had not used it prior to coming to the AUTEC base, approximately six months before the accident. He stated that as a ship's plumber, he simply did not use chemicals. Mr. Canavan further maintained that the drum of caustic soda, from which he secured his supply, did not have any instructions or warning labels on the drum.

PP & G, the manufacturer of the caustic soda in question, maintained that the drum was properly labeled and marked when it left its possession and that the labels and markings had been approved by a Government inspector. PP & G further contended that if, in fact, the drum did not have the proper label at the time. of this incident, it was because the drum was over four years old at that point in time and had been subjected to improper and rough handling by third parties who were totally outside their control.

The Plaintiffs' sole claim against PP & G centered around the sufficiency and adequacy of the label. The questions were as follows: whether the label had been properly affixed to the drum, whether the label was of the right size and shape when it was affixed, and whether additional coatings or coverings could have been applied to the label that would have made it more durable.

All parties agreed that the Plaintiffs' likelihood of recovery on this difficult case was no better than 50/50. Further, they concurred in the belief that if the Plaintiffs were ultimately successful in establishing liability, there would undoubtedly be a large reduction in the ultimate verdict due to substantial comparative negligence alleged by the Defendants. Therefore, even if the Plaintiffs were successful in obtaining a large jury verdict, a reduction for comparative negligence could possibly have reduced the ultimate recovery to an amount that would not even pay the existing lien of the employer, R.C.A. Service Corporation, who had been providing benefits through their insurance carrier from the time of the accident, which lien currently amounted to approximately $320,000.

Washington Chemical Sales was another Defendant in this lawsuit. It had been sued as the broker in the transaction, wherein Washington Chemical bid the contract with the Government and .assigned the performance of the contract to PP & G. Washington Chemical Sales, however, had not played an active role in the manufacturing or labeling of the product in question.

PP & G and Washington Chemical Sales had sued the United States Government on a Third Party Claim. The Cross-Plaintiffs alleged that any deficiency in the warning was brought about by the improper or inadequate inspection performed by the Government at the time the shipment was completed in Corpus Christi, Texas and inspected by the Government Inspector in accordance with the contract requirements at Corpus Christi Texas.

### III

### OBSTACLES TO SETTLEMENT

The greatest impasse this Court and the parties to this litigation had to face was the Longshoreman and Harbor Workers lien that was stated to be in excess of $320,000 in past benefits alone. The lien of R.C.A. Service Corporation, through their carrier, Zurich American Insurance Company, receives the highest priority from the Court. A review of the current case law reveals that the past lien would be paid after the payment of attorney fees and costs. Further, case law indicates that all future payments owed or to be paid would likewise be subject to 100% reimbursement from any fund produced by the settlement.

*Bloomer v. Liberty Mutual Insurance Co.*, 445 U.S. 74, 100 S.Ct. 925, 63 L.Ed.2d 215 (1980) is the case that most thoroughly explores the comprehensive scheme of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.* The Court affirmed the court of appeals' conclusion that a stevedore should not be required to pay a share of the longshoreman's legal expenses in a suit brought against the shipowner and reviewed the operation of the Act itself:

> The longshoreman is not required to make an election between the receipt of compensation and a damages action against a third person, 33 U.S.C. § 933(a). After receiving a compensation award from the stevedore, the longshoreman is given six months within which to bring suit against the third party. 33 U.S.C. § 933(b). If he fails to seek relief within that period, the acceptance of the compensation award operates as an assignment to the stevedore of the longshoreman's rights against the third party. The Act makes explicit provision for the distribution of any amount obtained by the stevedore in a suit brought purusant to that assignment. The stevedore is entitled to reimbursement of all compensation benefits paid the employee, and its costs, including attorney's fees.

*Id* at 77–78, 100 S.Ct. at 927–28. The Petitioner attempted to appeal to the equitable principle that when a third person benefits from litigation instituted by another, that person may be required to bear a portion of the expenses of the suit. In light of its interpretation of the legislative history of the Act, the Court refused to accept this argument.

The Court felt that the lien arising from the application of the Act simply does not permit equitable considerations, such as the degree of comparative negligence, the amount of available coverage or the costs that have been incurred. Instead, a court must mechanically award 100% of past and future payments right back to the carrier. According to the *Bloomer* Court, this result was mandated by the dual aims of Congress—to prevent the duplication of benefits and to relieve the congestion of the courts.

This Court, however, can not help but find sagacity in the Dissenting Opinion:

> The Court's approach in this case strikes me as somewhat crabbed. By tilting with the specter of 'double recovery,' the Court adopts a construction of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.*, that relegates the injured longshoreman's welfare to secondary status, well behind the interest of his stevedore-employer in conserving resources.
>
> Under the Court's rule, the stevedore has everything to gain and nothing to lose. The longshoreman takes the risk and the worry of the litigation and, if he gains enough, the stevedore is home free. This result does not seem to me to square with the Court's recent recognition that the Act should be construed with the beneficient purpose of worker protection foremost in mind.

*Id.* at 88–89, 100 S.Ct. at 933. This Court's experience with the *Bloomer* construction of the Act only substantiates Justice Blackmun's convictions. Not only does the majority interpretation fail to effectuate the purpose of the Act—to provide protection for employees, but it also discourages settlement and promotes, rather than deters, the congestion of the courts. In fact, in the specific context of the *Canavan* settlement colloquy, the law enabled R.C.A. Service Corporation, through their carrier, Zurich American Insurance Company, to take an inflexible position with regard to the past and future payments. In turn, the law deprived the Court of any leverage in this regard to promote and to urge the amicable resolution of the matter. In light of *Bloomer*, the lien became the insurmountable barrier to any meaningful settlement.

It developed that, if the lienholder chose to remain firm in pursuing their statutory right, and if the Plaintiffs were successful at trial, but received a verdict of less than $1,500,000, the Canavans could conceivably

receive no money and lose all future compensation benefits. Likewise, if the Plaintiffs were unsuccessful, the Canavans would owe costs to their counsel in an approximate sum of $70,000 and would face cost judgments by the Defendants in like amounts.

Accordingly, in order to avoid, if at all possible, a disastrous result to the severely injured Claimant, this Court appealed to the good will of all the parties. This Court urged the parties to carefully review, and in fact, to modify their position so that the case could be settled at a reasonable figure with the Claimant's net position being improved, rather than worsened by the result of nine years of litigation.

## IV

### THE SETTLEMENT

Accordingly, once the lienholder, Zurich American, indicated that they would materially reduce their demands in regards to reimbursement, the parties were freed to conduct meaningful settlement discussions. All parties, acting in good will and with the best interests of their clients uppermost in their minds, were able to resolve their differences on the following basis.

A. PP & G will fund a sum of money to the lienholder, Zurich American, in the approximate amount of $325,000 as repayment of the existing lien, with the proceeds of the payment being used to buy two annuities for CANAVAN. The first annuity to be made in the name of EDWARD CANAVAN for life, with payments to continue to his wife upon his death in the amount of $2400 per month. This annuity is in lieu of any further payments from Zurich American to EDWARD CANAVAN for loss of wages and other employment benefits. CANAVAN is currently receiving approximately $1100 bi-monthly, with certain rights to have that amount increased based upon the cost of living. However, CANAVAN will give up all entitlement to further increases in this amount and the annuity will stand in its place and will remain constant at $2400 per

month, regardless of any changes in the cost of living. The second annuity to JANICE CANAVAN will be in the amount of Four Hundred Dollars ($400) per month to be purchased from the same fund as set forth above. Likewise, JANICE CANAVAN will not be entitled to any increases in this amount.

B. The exact amount that will be funded to Zurich American cannot be determined at this point in time, but it will depend upon the price of annuities at the time the funding is actually completed, and the sum will be sufficient to pay any transfer costs or internal expenses experienced by Zurich American in putting the annuities in place. It is contemplated that the total payment for these annuities will be in the approximate amount of $325,000, plus or minus, as necessary. Further, PP & G will make an additional payment, over and above the payment set forth above, to the claimants in an amount so that their total payment will be in the amount of $750,000. By making said payments, PP & G will fulfill all of its obligations to the Plaintiffs and will have no future obligations to the Plaintiffs in that regard.

C. WASHINGTON CHEMICAL will make a payment of $62,500 to the claimants. By making said payments, WASHINGTON CHEMICAL will fulfill all of its obligations to the Plaintiffs and will have no future obligations to the Plaintiffs in that regard.

D. The UNITED STATES GOVERNMENT will make a total payment of $62,500 to WASHINGTON CHEMICAL and PP & G, who, in turn, will convey the payment over to the Claimants to complete the funds paid to the Claimants in settlement of this claim. By making said payments, the UNITED STATES GOVERNMENT will fulfill all of its obligations to the Parties and will have no future obligations to the Parties in that regard.

E. Claimants' attorney will reduce his attorney's fee by $50,000. His outstanding costs will be paid from the fund and the Claimants will receive a lump sum cash payment of between $150,000 and $175,000.

F. The lienholder, Zurich American, will continue to make the $70.00 per week payment to JANICE CANAVAN, in the event she is providing homemaker-type care, with the payment going to EDWARD CANAVAN if at any time JANICE CANAVAN does not provide that service. It is specifically agreed by the parties that the Claimants will not be entitled to any increase in nursing care payments, now or in the future and that they are giving up their right right to any extended nursing home care as a part of the overall settlement on the lien. Further, it is understood by and between the parties that all future medical care will remain in place. This includes hospital, doctors, transportation and medication, therapy and recovery care.

G. Zurich American has specifically agreed to this settlement, which is a necessary procedure in order for the claimants not to forfeit entitlement to all future benefits.

H. This settlement is contingent upon final approval by the Deputy Commissioner in regards to the obligations of the compensation carrier, Zurich American.

### V

### CONCLUSION

This Court is convinced that all the parties to this settlement agreement have acted in good faith in arriving at an overall settlement plan that is in the best interests of their respective clients and in particular, the claimants. This Court is of the view that, in light of the current status of the law in regards to the lien of insurance companies providing Longshoremen and Harbor Worker Benefits, that the Claimant faced a real possibility, even if he were successful at trial, of worsening his overall position.

This settlement resolves all pending and possible claims by and between the Parites: i.e. CANAVAN; PP & G; WASHINGTON CHEMICAL SALES; the UNITED STATES GOVERNMENT; RCA SERVICES CORPORATION, arising out of the claim for injuries as a result of the accident of November 4, 1986. It is contemplated between these parties that all expected and/or threatened claims for contribution and/or indemnification will be resolved within the framework of this settlement so as to terminate all litigation of every type and nature between the parties. Further, in conformity with the settlement terms upon which all parties agreed, no costs shall be taxed against any party, and each party shall be responsible for bearing its own costs.

Therefore, in light of all the factors that have been set forth in this Order, this Court is of the view that the settlement is a fair and equitable settlement and it protects the interests of the claimants and permits the resolution in a satisfactory manner of an extremely difficult products liability case.

ACCORDINGLY, this Court fully approves the settlement and urges its swift approval by the Deputy Commissioner so that benefits can be funded and the matter finally resolved.